**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WATERKEEPER ALLIANCE, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES COAST GUARD, )<br><br>Defendant. )<br><br>TAYLOR ENERGY COMPANY LLC, )<br><br>Intervenor-Defendant. ) | Civil Action No.  13-289 (RMC) |

**OPINION**

When Hurricane Ivan tore through the Gulf of Mexico in 2004, it caused an oil

drilling platform operated by Taylor Energy Company to collapse into the sea.  Since that time,

Taylor Energy Company LLC has been working with the Coast Guard and other federal agencies

to decommission the multiple oil wells affected by the platform's destruction.  In 2011,

Plaintiffs—a group of organizations concerned with water pollution, public health, and natural

resources in the Gulf of Mexico—began to monitor an oil leak caused by the damage done to

Taylor Energy's oil wells during Hurricane Ivan.[1]  Shortly thereafter, Plaintiffs sought records

from the Coast Guard under the Freedom of Information Act; they now complain that the

responses are legally insufficient.  Plaintiffs and the Coast Guard, as well as Intervenor-

Defendant Taylor Energy, have all moved for summary judgment.

---

[1] Plaintiffs are the Waterkeeper Alliance of New York, New York; the Atchafalaya Basinkeeper of Baton Rouge, Louisiana; the Galveston Baykeeper of Seabrook, Texas; the Apalachicola Riverkeeper of Apalachicola, Florida; and the Louisiana Environmental Action Network.

The Court concludes that the Coast Guard properly redacted or withheld certain records under FOIA Exemption 4, which protects trade secrets and commercial information that would injure the submitter if released, and Exemption 5, which protects government communications related to ongoing investigations or internal recommendations and analyses. Thus, Plaintiff's motion for summary judgment will be denied and the Coast Guard's and Taylor Energy's motions for summary judgment will be granted in part. However, the Coast Guard has failed to address whether any information in the withheld documents is segregable and might be released. For this reason, a remand to the Coast Guard is necessary. The Court will also direct the Coast Guard to submit a revised *Vaughn* index for FOIA request 2012-0684 that includes descriptions for all documents referred to other agencies.

## I.   FACTS

Hurricane Ivan hit the Gulf of Mexico in September 2004. The hurricane caused a massive underwater landslide in the vicinity of an oil platform in Mississippi Canyon Block 20, known as the MC20 Platform. The landslide led to the destruction of the MC20 Platform, which toppled and collapsed into the ocean. The MC20 Platform was operated by Taylor Energy Company LLC (Taylor or Taylor Energy), which has spent the ensuing years working under a Unified Command Structure of federal agencies to remove the MC20 Platform, decommission its wells, and contain any oil that may leak from the wells. *See* Decl. of Lt. Comm. Damian Yemma Re: FOIA Request 2012-0684 (Yemma Decl.) [Dkt. 32-2], ¶¶ 5-6. In the Unified Command, the primary role of the United States Coast Guard (Coast Guard or USCG) is as the Federal On-Scene Coordinator (FOSC) for oil spill response; it operates out of the USCG New Orleans sector. Yemma Decl. ¶ 6. The FOSC been working with Taylor Energy on its efforts to develop and implement oil collection and containment systems at the MC20 site. *Id.* Because of its

coordinating responsibilities, the Coast Guard has received copies of documentation relating to the decommissioning efforts that have been exchanged between, or originated by, Taylor Energy, the Bureau of Safety and Environmental Enforcement (BSEE), and other federal agencies.  *Id.*

Taylor Energy's work on decommissioning the MC20 oil wells was unfinished in the summer of 2011, when Plaintiffs (collectively, Waterkeepers) began to monitor a chronic oil leak originating from the continental shelf, eleven miles off the Louisiana coast.  Waterkeepers eventually traced the leak to the September 2004 underwater landslide caused by Hurricane Ivan, which had toppled the MC20 drilling platform and buried its oil wells.  Upon learning that the Coast Guard was the coordinator of a joint command of federal agencies dealing with remediation, Waterkeepers sent a request for records to the Coast Guard under the Freedom of Information Act (FOIA), 5 U.S.C. § 552.  *Id.*

### A.  FOIA Request 1 (Request No. 2012-0212)—October 19, 2011

By letter dated October 19, 2011, Justin Bloom, Waterkeepers' Eastern Regional Director, asked for:

> Any and all public records relating to reporting, investigation or other response activities associated with releases of oil or other pollutants from the platform and/or associated wells or pipelines identified in the attached and referenced National Response Center Incident Reports. The Reports indicate that the incident location was or is a platform at Mississippi Canyon 20A, associated with Taylor Energy.   Specific geographic coordinates are provided, along with information about the quantity and nature of the release.   Most reports indicated that the releases from the site are the result of damage to a platform due to Hurricane Ivan which moved across the Gulf of Mexico in September of 2004. Please note that this request is not limited to the date of the reports provided.   [National Response Center (NRC)] reports for this site have consistently been generated and submitted to your agency since September 2004 and continue to be submitted on a regular basis.  This is an ongoing spill and we seek any and all information relating to agency responses related to all releases originating from the site.

USCG Mem. [Dkt. 32] ¶ 2 (citing Decl. of Dawn Patterson (Patterson Decl.) [Dkt. 32-1] ¶ 3).[2]

The Coast Guard designated the request as USCG FOIA 2012-0212.  Andrea Tobias, an employee working in the Freedom of Information Act and Data Administration Division for the Office of Investigations and Analysis (CG-INV-3), searched the Coast Guard Marine Information for Safety and Law Enforcement (MISLE) Database for relevant documents. MISLE is the Coast Guard's "primary operations business support system" that stores extensive information concerning inspection schedules, casualty investigations, pollution response actions, law enforcement actions, and search and rescue operations.  USCG Mem. ¶ 1.  "The data[base] stores Coast Guard investigative records concerning pollution, shipping, and port incidents that occur in United States territorial waters."  *Id.*

Ms. Tobias responded to Mr. Bloom via email on November 10, 2011, acknowledging receipt of his FOIA request and informing him of the types of records she could identify that might be responsive regarding "Taylor Energy," "Mississippi Canyon," and "20A." *Id.* ¶ 4; Patterson Decl. ¶ 4.  However, she advised that his request was too ambiguous for further processing and asked him to narrow its scope.  USCG Mem. ¶ 4.  Mr. Bloom replied, "I think Mississippi Canyon 20 is where these wells are, 20A may be too specific."  Patterson Decl. ¶ 4; *see also id.*, Ex. B at 15.[3]  Ms. Tobias reviewed all the files she had found that involved Taylor Energy and informed Mr. Bloom that the Coast Guard was currently investigating the incident at

---

[2] Defendants filed three documents together as one entry on ECF: (1) Defendants' Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment; (2) Defendants' Statement of Material Facts Not in Genuine Dispute, and (3) Defendants' Memorandum in Support (USCG Mem.).  For purposes of clarity, the Court will cite to the corresponding document and paragraph number (for the statement of facts) or ECF page number (for the legal memorandum) when referring to these sources.

[3] The Patterson Declaration includes multiple exhibits with independent paginations. For ease of reference, the Court will cite to the relevant ECF page numbers when referring to exhibits attached to the Patterson Declaration.

Mississippi Canyon Block 20A; specifically, she told Mr. Bloom that she had "found one investigation . . . that is under Taylor Energy, Block 20A and notes the damaged platform from [H]urricane Ivan, NRC report number 735409. . . .  Do you think this is the report you are requesting?"  Patterson Decl. ¶ 5; *see also id.*, Ex. D at 19.  Ms. Tobias also asked Mr. Bloom to review a list of Coast Guard investigation activities related to his request and to further refine the scope of his request.  *Id.* ¶ 5.  Mr. Bloom answered on January 10, 2012, confirming that he wanted "to limit the response to just Block 20 and 20A."  *Id.* ¶ 5; *id.*, Ex. D at 18-19.

Ms. Tobias responded promptly on January 11, 2012, stating that she was processing Waterkeepers' request and that she would redact personal information under the Privacy Act, 5 U.S.C. § 552a.  *Id.*, Ex. D at 18.  She also advised that "one of these Activities is still [o]pen and in process and therefore cannot be released until the investigation is complete." *Id.*  Ms. Tobias offered a link to the Coast Guard database so that Mr. Bloom could monitor the status of the open activity on his own.  *Id.*  Mr. Bloom agreed to the Privacy Act redactions but questioned why there might be any other restriction: "Surely there is a way to restrict information that would potentially harm the investigation if released, while providing information about the spill that the public should have access to."  *Id.*  In response, Ms. Tobias suggested "putting the case through a legal review," as only the legal department could deem the records appropriate for release, although it could take "anywhere from three to nine months." *Id.*, Ex. D at 17.  Mr. Bloom answered that he "consider[ed] [her] response as a denial" that he would consider appealing, but that in the meantime, he would like to have access to the documents available for review.  *Id.*

The Coast Guard formally responded to Mr. Bloom regarding Waterkeepers' October 2011 FOIA Request on January 20, 2012.  *Id.*, Ex. E at 22.  It forwarded 40 pages of

records "concerning oil spills at or near Block 20 and 20A in the Mississippi Canyon originating on Sept[ember] 17, 2004," and stated this was "all of the information requested in [Mr. Bloom's] letter of October 19, 2011, as amended by the email correspondence" between Mr. Bloom and Ms. Tobias. *Id.* Consistent with Ms. Tobias' email, the Coast Guard advised that certain requested documents "may contain information that may be protected from release . . . . Your request is being processed in accordance with Coast Guard policy . . . ." *Id.*

By further letter dated June 25, 2012, the Coast Guard released additional records to Waterkeepers "concerning the incident and investigation (Activity number 3253635) involving Taylor Energy and an oil spill near Block 20A in the Mississippi Gulf originating on Sept. 17, 2004." *Id.*, Ex. F at 63. Having located 256 pages of responsive material, the Coast Guard released 19 pages, with some information redacted from a single page, and withheld 237 pages entirely. *Id.* The letter explained:

> Incident Investigation Activity 3253635 is still under investigation. The material has been withheld in accordance with 5 U.S.C. 552(b)(5) because the contents of an ongoing investigation case are predecisional material, and release of this material would discourage open and frank exchanges in future investigations. Premature release of this information would also cause public confusion by disclosing findings and recommendations that may not reflect the final agency action.
>
> This material has also been withheld in accordance with 5 U.S.C. 552(b)(7)(A) because the material was compiled for law enforcement purposes and release could reasonably be expected to interfere with an ongoing law enforcement proceeding. . . . [T]here may be other exemptions which could protect certain information from disclosure, such as FOIA Exemptions 7(C), 7(D), and 7(E).

*Id.*

On August 10, 2012, Waterkeepers wrote to Ms. Tobias asking for a *Vaughn* index of the withheld records.[4]   *Id.* ¶ 10.  That request was denied and on August 20, 2012, Waterkeepers appealed the partial denial of FOIA Request 2012-0212 and the refusal to provide a *Vaughn* index or privilege log.[5]   *Id.*, Ex. H at 84.  Waterkeepers contended that "[n]either the 'Privileged Information' nor the 'Law Enforcement Records' exemption justifies withholding documents critical to the public understanding of an eight year long oil leak."  *Id.*  Receiving no response from the Coast Guard, Waterkeepers wrote again on November 20, 2012.  *Id.*, Ex. I at 89.  The Coast Guard answered on December 12, 2012, explaining that it had a backlog of FOIA appeals that required thorough research, analysis, and review at high levels to ensure that an appropriate decision was made.  *Id.*, Ex. J at 91.  The letter further advised that appeals are addressed in the order received and that the agency could not predict when it would decide Waterkeepers' appeal.  *Id.*

On April 10, 2013, Coast Guard Rear Admiral R.L. Day, Assistant Commandant for Command, Control, Communications, Computers and Information Technology, notified Waterkeepers of the agency's formal denial of their appeal.  *Id.*, Ex. K at 93.  The Coast Guard decided that the records in question were protected from disclosure under FOIA Exemption 5 because they are "intra-agency, pre-decisional communications consisting of analyses, judgments, conclusions, opinions, and recommendations made by Coast Guard officials."  *Id.*

---

[4] *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) (requiring itemized index correlating each withheld document, or portion thereof, with a specific FOIA exemption and agency's nondisclosure justification).

[5] The Coast Guard did not provide a *Vaughn* Index for Waterkeepers' first FOIA request until November 8, 2013, after it had received objections to the administrative record in this litigation. Dkt. 29, ¶ 8.  The Coast Guard states that it was "under the impression that plaintiffs would not need a *Vaughn* index for FOIA request 2012-0212 because each of the documents fell under the same exemptions." *Id.* ¶ 9.

The letter further stated that "the facts generated in the course of this decision-making process are inextricably connected to the deliberative material, and thus impossible to reasonably segregate." *Id.*, Ex. K at 93-94.  Finally, the Coast Guard explained that the records did not reflect a final decision but instead contained "opinions, analyses, and/or recommendations" that were deliberative and pre-decisional in nature.  *Id*. at 94.

The Coast Guard also based its withholding decision on Exemption 7(A), which protects information compiled for law enforcement purposes if its release could reasonably be expected to interfere with enforcement proceedings.  5 U.S.C. § 552(b)(7)(A).  Specifically, the letter stated:

> (1) *Investigation Activity Number 3253635 is still pending*.  The Coast Guard is a law enforcement agency conducting a marine casualty investigation regarding the subject incident.  Until the final review of this investigation is concluded, advance release of its supporting documentation could prove problematic and easily lead to speculation and misunderstandings. . . . Although Exemption 7(A) is temporal in nature and is not intended to endlessly protect material simply because it is in an investigatory file, it nevertheless remains viable throughout the duration of long-term investigations.

> (2) *Release of Investigation Activity Number 3253635 could cause harm if publicly disclosed.*  Premature release of information could create confusion among the public as to what is fact, impede the investigatory process, and/or hinder potential legal courses of action.

*Id.* (emphasis in original) (internal citations omitted).  The April 10 letter concluded by advising Waterkeepers that it was the final administrative decision on FOIA Request 2012-0212 and that Waterkeepers had the right under FOIA to seek judicial review.  *Id.* at 95.

**B. FOIA Request 2 (Request No. 2012-0684)—December 5, 2011**

On behalf of Waterkeepers, the Tulane Environmental Law Clinic submitted a second FOIA request to the Coast Guard on December 5, 2011, requesting various additional documents relating to the decommissioning of oil wells associated with the MC20 Platform.[6] *See* Yemma Decl. ¶ 5; *id.*, Ex. 1 at 15-16.[7] The Coast Guard Management Programs and Policy

---

[6] Waterkeepers requested the following documents:

a. Any documents relating to the specific wells required to be plugged or abandoned.
b. Any documents relating to the scope or duration of the decommissioning efforts.
c. Any documents relating to analysis of the probability of success of any decommissioning efforts.
d. Any permits, permit requests, permit modification, permit modification requests, or any other authorization, request for authorization, or similar documents related to MC 20.
e. Any documents submitted by Taylor or any other person or entity in support or opposition to any permit related documents requested in part 4.
f. Any documents relating to analysis or consideration of the environmental impact of the decommissioning efforts or any report or document concerning the environmental impact of the efforts.
g. Any documents relating to the U.S. Coast Guard or any governmental agency's involvement in the decommission efforts.
h. Any documents relating to the Coast Guard's or any governmental agency's decision to charge Taylor with any fines penalties, fees, or violations under the Clean Water Act, the Oil Pollution Act, the Resource Conservation and Recovery Act, or any other statute or regulation, due to any activity or occurrence at or near MC20.
i. Any documents relating to any agreement, trust, or contract between the Coast Guard or any governmental agency and Taylor.
j. Any documents relating to any agreement, trust, or contract related to the decommissioning efforts of MC 20 between the Coast Guard or any governmental agency and BP; BP America; BP Exploration & Oil, Inc.; BP Exploration & Production, Inc.; or any other entity that is related to the decommissioning efforts.
k. Any documents relating to the deadline for completion of the performance of the decommissioning efforts, any documents detailing the satisfaction or failure to satisfy any deadlines, any requests from Taylor for extension of deadlines, and any responses to any requests for deadline extensions.

Yemma Decl. ¶ 5.

[7] Like the Patterson Declaration, the Yemma Declaration includes multiple exhibits with independent paginations. For ease of reference, the Court will cite the relevant ECF page numbers when referring to exhibits attached to the Yemma Declaration.

Division received the FOIA request and assigned it control number 2012-0684. *Id.* ¶ 9.  On

January 4, 2012, the Eighth Coast Guard District Legal Office (D8 Legal Office) received the

request and notified Waterkeepers of its receipt on January 9.  *Id.* ¶¶ 1, 10, 11.

The D8 Legal Office was unable to locate any records under its control that were

responsive to FOIA Request 2012-0684; it thus forwarded the request to USCG Eighth District

staff offices and Sector New Orleans to expand the search.  *Id.* ¶ 12.  On January 31, 2012, the

D8 Legal Office received notice from both the Eighth District Waterways branch, which had no

responsive records, and Sector New Orleans, which did.  *Id.* ¶¶ 13-14.  Sector New Orleans

determined that, based on a cursory review, the records might contain proprietary information

belonging to Taylor Energy; accordingly, the D8 Legal Office prepared a "Predisclosure notice

to Submitter" for Sector New Orleans to send to Taylor Energy.  *Id.* ¶ 14; *id.* at 23.  The Notice

alerted Taylor Energy to FOIA Request 2012-0684 and gave it an opportunity to review the

records and make any objections to their release under FOIA Exemption 4.  *See* 5 U.S.C.

§ 552(b)(4) (protecting trade secrets and commercial or financial information that is privileged or

confidential).

Sector New Orleans sent the predisclosure notice to Taylor Energy on February 3,

2012 and, on March 7, 2012, notified Waterkeepers that Taylor Energy had asked for more than

ten days to review and comment.  Yemma Decl. ¶¶ 16, 18; *id.*, Exs. 6, 7 at 25-28.  Taylor Energy

submitted its consultation response and objection letter on March 27, 2012, which Sector New

Orleans forwarded to the D8 Legal Office to complete its review and release of records.[8]  *Id.*

---

[8] After analyzing the large number of responsive records, the complexity of the response, and the
expectation that release of some records may be denied, Sector New Orleans transferred the
request to the D8 Legal Office because the D8 Legal Office provides advice regarding the denial
of records to the Eighth District Commander, who is the only official authorized to deny the
release of records under FOIA; Sector New Orleans does not have that authority.  Yemma Decl.
¶ 20.  Thus, if Taylor Energy's objections were found to have merit, and the Coast Guard denied

¶¶ 19-20.  The D8 Legal Office provided an update to Waterkeepers by telephone and email on

April 10, 2012, without forecasting a date by which decisions on release might be made.[9]  *Id.*

¶ 21.  On June 4, 2012, the D8 Legal Office sent a status update to Sector New Orleans, so that it

could send a direct response to Waterkeepers, stating that the D8 Legal Office was continuing to

process the records for exemption review and was coordinating with other government agencies.

*Id.*  ¶ 22.  The D8 Legal Office contacted BSEE on June 5, 2012 asking that both agencies

coordinate on the FOIA response.  *Id.* ¶ 23.  BSEE responded that it had received the exact same

FOIA request and because BSEE had 40 FOIA requests already in queue, it would be at least six

months before a response could be prepared.  *Id.* ¶ 24; *id.*, Ex. 12 at 34-35.

On June 11, 2012, the D8 Legal Office sought guidance from Coast Guard

Management Programs and Policy Division on processing the 3500 pages of potentially

responsive documents and coordinating within the agency, as well as requirements for reviewing

and tracking the documents.  *Id.*  ¶ 26; *id.*, Ex. 13 at 37-38.  It was advised that although the

Coast Guard had consulted with Taylor Energy, it must review all documents and make the final

determination about whether to release them, and that all responses must be tracked.  *Id.* ¶ 27;

---

any part of Request 2012-0684, that denial would have to have come from the Eighth District
Commander.

[9]  The email to Waterkeepers' counsel stated that Taylor Energy had been consulted and Sector
New Orleans had forwarded the packet to D8 Legal Office.  It further noted:

> Our legal office will now review the documents for any potentially
> exempted material.  If material requires redactions and/or withholding
> from release, the packet must be approved by the District Commander.
> We are working this request as soon as practicable, but the request is a
> large request which requires greater effort and time in order to ensure we
> conduct our review with due diligence.  While we do not have an
> estimated time for completion, we are able to, and intend to, release
> documents as they become available for release per your phone request.

Yemma Decl., Ex. 10 at 31.

*id.*, Ex. 13 at 37.  The D8 Legal Office provided a status update to Waterkeepers on October 1, 2012, stating that their request continued to be under review for exemptions and redactions.  *Id.* ¶ 28; *id.*, Ex. 14 at 39.  In late February 2013, the D8 Legal Office called BSEE for a status update on the processing of Waterkeepers' identical FOIA request to that agency.  *Id.* ¶ 29.

On March 5, 2013, Waterkeepers filed this lawsuit.  Compl. [Dkt. 1].  On March 8, 2013, the D8 Legal Office forwarded 2,698 pages of records to BSEE for its independent review and direct response to Waterkeepers; these documents were copies of records from Taylor directed to BSEE related to the decommissioning of the wells at MC20 with copies held by the Coast Guard.  Yemma Decl. ¶¶ 30, 32.  On that same date, the D8 Legal Office forwarded 11 pages of records to the National Oceanic and Atmospheric Administration (NOAA) for its review.  *Id.* ¶ 32.  Also on March 8, the D8 Legal Office provided an initial release of 55 pages of Coast Guard records (39 responsive documents) to Waterkeepers.  *See id.*, Ex. 15 at 41-42.  In its transmittal letter, the Coast Guard explained that it had referred 2,895 pages to BSEE, eleven pages to NOAA, and eight pages to the Department of Transportation (DOT), for those agencies' review and direct response to Waterkeepers.  *Id.*, Ex. 15 at 42.  In sum, the Coast Guard retained 429 pages for further Coast Guard review on potential exemptions; 351 uncategorized pages that were not yet identified as Coast Guard records; and 2,717 pages of other agency records that were forwarded to the appropriate agencies for direct response to Waterkeepers.  *Id.*  On March 11, 2013, the D8 Legal Office forwarded an additional 277 pages of documents to BSEE for review and direct response to Waterkeepers.  *Id.* ¶ 34.

On March 14, 2013, the D8 Legal Office emailed Taylor's counsel asking Taylor to reevaluate certain documents that it had previously claimed were exempt from release.  *Id.* ¶ 37; *id.*, Ex. 17 at 44-46.  On March 15, 2013, the D8 Legal Office provided a second release of

22 pages of responsive Coast Guard records to Waterkeepers. *Id.*, Ex. 18 at 47-48. On March 29, 2013, the D8 Legal Office wrote again to Waterkeepers and released 31 pages of Coast Guard records with personally identifiable information redacted. *Id.*, Ex. 19 at 49. The D8 Legal Office further informed Waterkeepers that the remaining 530 pages of Coast Guard documents that were responsive were potentially exempt from release under FOIA Exemptions 4 and 5 and would therefore be reviewed by Rear Admiral Nash, USCG Eighth District Commander. *Id.* On May 21, 2013, the D8 Legal Office notified Waterkeepers that there remained approximately 500 pages of records to be reviewed and that the Coast Guard District Commander was now Rear Admiral Kevin Cook, who was the sole official in the area authorized to deny the release of information under FOIA. *Id.*, Ex. 20 at 51.

Admiral Cook wrote to Waterkeepers on July 8, 2013 with the Coast Guard's final response to FOIA Request 2012-0684. *Id.*, Ex. 21 at 52-54. His letter stated that the Coast Guard had located 3,552 pages of potentially responsive records, of which 2,914 pages were copies of records submitted in the first instance to other federal agencies.[10] *Id.* Admiral Cook noted that the D8 Legal Office had first attempted to coordinate with these other agencies regarding release of their documents because the Coast Guard lacked the expertise to evaluate them. *Id.* ¶ 42. Once this lawsuit was filed, the D8 Legal Office forwarded the records to the appropriate agencies for independent review and release. *Id.* The D8 Legal Office released 226 pages, with only personal identifying information redacted, including 32 pages of internal communications which were exempt from disclosure but released under the discretion of the Eighth District Commander. *Id.* ¶ 43a. The D8 Legal Office withheld 263 pages in their entirety

---

[10] The number of responsive records is an approximation throughout because some Coast Guard reports counted the same documents more than once. Yemma Decl., Ex. 18 at 47.

and 14 pages in part under Exemption 4 "to protect the submitter's proprietary interests."[11]  *Id.*, Ex. 21 at 52-53.  The D8 Legal Office withheld an additional 125 pages of records in their entirety, and four pages in part, under Exemption 5; these records were internal emails discussing proposed Coast Guard responses to media inquiries regarding MC20, shortly after British Petroleum lost its drilling platform, Deepwater Horizon, in the Gulf of Mexico in 2010. *Id.* ¶ 43c.  The remaining six pages of records were not released because they were not responsive.  *Id.* ¶ 43d.

Waterkeepers appealed the denial of FOIA Request 2012-0684 by letter dated August 12, 2013.  Patterson Decl., Ex. L at 96-99.  Complaining that the Coast Guard had withheld 388 pages entirely and 18 pages in part, and that 149 of the remaining 226 released pages had personal information redacted, Waterkeepers argued that "[n]either the 'Trade Secrets' nor the 'Privileged Information' exemption justifies withholding documents critical to the public understanding of a nine year long oil leak."  *Id.*, Ex. L at 96.  Waterkeepers also noted that the

---

[11]  LCDR Yemma declares:

> This office's independent review of these records found that a majority . . . were voluntarily submitted to the Coast Guard because the Coast Guard did not exercise any authority to gain possession of these records. This information consists of mostly email and other correspondence, and records which [Taylor Energy] prepared for BSEE, but provided as a courtesy copy to the USCG.  As this information was voluntarily submitted to the Coast Guard, and because Taylor Energy asserted a proprietary interest in the information described in the records, and that they would not normally release such information to the public, these records are categorically excluded under Exemption 4.  The remaining records withheld under this exemption were involuntarily submitted to the Coast Guard pursuant to an Administrative Order or other request for information specifically originating from the Coast Guard to Taylor Energy.  These records were withheld pursuant to Taylor Energy's claim that release of the information would cause a commercial disadvantage to Taylor Energy.

Yemma Decl. ¶ 43b.

Coast Guard had sent 2,914 pages to other agencies, most of which had not yet been produced. *Id.* The main thrust of Waterkeepers' argument was that the Coast Guard's reliance on FOIA exemptions was based on conclusory statements. *Id.*, Ex. L at 97. Waterkeepers further argued that because Taylor Energy was required to release information to the Coast Guard, Taylor's records are not protected as trade secrets under Exemption 4, and that the Coast Guard failed to support its claim that the release of any documents under Exemption 5 would discourage the expression of candid opinions within the agency. *Id.*, Ex. L at 97-98.

On October 21, 2013, the Coast Guard served Waterkeepers with the *Vaughn* index for FOIA Request 2012-0684. *See* Dkt. 29, ¶ 2. On December 3, 2013 the Coast Guard filed a *Vaughn* Index for FOIA Request 2012-0212 (*Vaughn* Index 1) [Dkt. 28-1 at 11-16] and a revised *Vaughn* Index for FOIA Request 2012-0684 (*Vaughn* Index 2) [Dkt. 28-1 at 5-10].[12]

## C.  The Instant Litigation

Waterkeepers filed their Complaint on March 5, 2013, asserting two separate causes of action. First, they allege that the Coast Guard withheld non-exempt materials responsive to Waterkeepers' October 19, 2011 FOIA Request 2012-0212, and second, that the Coast Guard failed to disclose timely all responsive non-exempt materials to Waterkeepers' December 5, 2011 FOIA Request 2012-0684.[13] *Id.* ¶¶ 44-45. Waterkeepers, the Coast Guard,

---

[12] The *Vaughn* Indices are also docketed independently at Dkts. 40-1 and 40-2.

[13] Taylor incorrectly asserts that Waterkeepers lack standing. Taylor Mem. at 9-11. The Supreme Court has instructed that "those requesting information under [FOIA] need show [no] more than that they sought and were denied specific agency records" to establish standing. *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989).

and Intervenor Defendant Taylor Energy all filed motions for summary judgment,[14] which are now fully briefed.[15]

## II.  LEGAL STANDARDS

Waterkeepers, the Coast Guard, and Taylor Energy all contend that there is no genuine dispute as to any material fact and that each is entitled to summary judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   When, as here, both sides move for summary judgment, neither is deemed to "concede the factual assertions of the opposing motion," *Competitive Enter. Inst. Wash. Bureau, Inc. v. Dep't of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006) (citation omitted); each motion is reviewed "separately on its own merits to determine whether [any] of the parties deserves judgment as a matter of law," *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (citation and internal quotation marks omitted).

FOIA cases are typically and appropriately decided on motions for summary judgment because the pleadings and declarations provide undisputed facts on which judgment as a matter of law may be entered.  *Miscavige v. Internal Revenue Serv.*, 2 F.3d 366, 368 (11th Cir. 1993); *McLaughlin v. U.S. Dep't of Justice*, 530 F. Supp. 2d 210, 212 (D.D.C. 2008).  In a FOIA case, a court may award summary judgment solely on the basis of information provided by the

---

[14] Waterkeepers' Reply appears to be docketed twice at Dkts. 37 and 38.

[15] Waterkeepers also filed a motion to strike arguments raised in Taylor's Reply.

department or agency in affidavits or declarations when the affidavits or declarations describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).  Affidavits submitted by the agency to demonstrate the adequacy of its response are presumed to be in good faith.  *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).  An agency must demonstrate that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly [or partially] exempt" from FOIA's requirements.  *Goland v. CIA*, 607 F.2d 339, 352, (D.C. Cir. 1978) (internal quotation marks and citation omitted); *see also Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973) (requiring agencies to prepare an itemized index correlating each withheld document, or portion thereof, to a specific FOIA exemption and the relevant part of the agency's nondisclosure justification).

In a FOIA case, the district court decides *de novo* whether an agency properly withheld information under a claimed exemption.  *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977).  "The underlying facts are viewed in the light most favorable to the [FOIA] requester," *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983), and the exemptions are narrowly construed.  *FBI v. Abramson*, 456 U.S. 615, 630 (1982).

FOIA also requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b)(9); *see also Oglesby v. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996).  Reasonably segregable information—that is, information that can be separated from the exempt

portions of a document—must be produced unless the non-exempt portions are "inextricably intertwined with exempt portions." *Trans-Pacific Policing Agreement v. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999); *Juarez v. Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008) ("[D]ocuments may be withheld in their entirety when non-exempt portions are inextricably intertwined with exempt portions.") (internal quotations omitted). "[W]hen an agency seeks to withhold information, it must provide 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" *King v. United States Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987) (quoting *Mead Data Cent.*, 566 F.2d at 251). "A court may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated for this reason." *Juarez*, 518 F.3d at 61 (citing *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996)). District courts have "'an affirmative duty to consider the segregability issue *sua sponte*.'" *Id.* at 60.

## III.   ANALYSIS

### A.  General Objections to the Coast Guard's Production

Waterkeepers raise various objections to the Coast Guard's production, some of which can be easily disposed of. First, Waterkeepers argue that the Coast Guard has released a very limited number of pages—approximately 310 of more than 3,800 pages identified as responsive to the two FOIA Requests—and that many records are redacted beyond comprehension; Waterkeepers complain, "This response is not good enough." Pl. Mem. [Dkt. 27-1] at 8. However, the actual number of records produced or withheld is irrelevant to whether

any given record is exempt under FOIA.  If the majority of requested records is legally protected, then the Coast Guard's release of only a fraction of responsive documents is entirely proper.

Second, Waterkeepers cite extensive case law for the proposition that FOIA is grounded in the "fundamental principle of public access to Government documents," *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989), as well as a Presidential Memorandum for Heads of Executive Departments and Agencies Concerning the Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 21, 2009) (President Barack Obama emphasizing a "profound national commitment to ensuring an open Government" and suggesting "a clear presumption: In the face of doubt, openness prevails").  Nonetheless, in a contested FOIA lawsuit, courts must recognize that FOIA represents a careful balancing of the public's interest in government transparency and "legitimate governmental and private interests [that] could be harmed by release of certain types of information." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (*en banc*) (quoting *Abramson*, 456 U.S. at 621).  *See also August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003).  Thus, the desire for public access does not warrant the disclosure of documents when an agency withholds them pursuant to a congressionally-designated exemption.

### B.  Objections to Referral of Documents to BSEE

In regard to their second FOIA request, No. 2012-0684, Waterkeepers contend that the Coast Guard's referral of documents to other agencies was improper.  To be sure, it is well settled that "[i]f an agency receives a FOIA request for documents within its possession, the agency is responsible for processing the request and 'cannot simply refuse to act on the ground that the documents originated elsewhere.'" *Keys v. Dep't of Homeland Sec.*, 570 F. Supp. 2d 59, 66 (D.D.C. 2008) (quoting *McGehee v. CIA*, 697 F.2d 1095, 1110 (D.C. Cir. 1983)).  "However,

an agency may adopt procedures by which documents in the agency's possession, but which did

not originate with the agency, may be referred to the originating agency for processing." *Id.* at

66-67.  An agency's referral constitutes withholding "if its net effect is significantly to impair the

requester's ability to obtain the records or significantly to increase the amount of time he must

wait to obtain them." *McGehee*, 697 F.2d at 1110.  In such circumstances, withholding is

"'improper' unless the agency can offer a reasonable explanation for its procedure." *Id.*; *see also*

*Hall v. CIA*, 881 F. Supp. 2d 38, 55 (D.D.C. 2012).

  The Coast Guard is an agency within the Department of Homeland Security

(DHS), which has adopted regulations governing FOIA referrals.  *See* 6 C.F.R. § 5.4.

Specifically, those regulations provide:

> (c) Consultations and referrals. When a component receives a request for
> a record in its possession, it shall determine whether another component,
> or another agency of the Federal Government, is better able to determine
> whether the record is exempt from disclosure under the FOIA and, if so,
> whether it should be disclosed as a matter of administrative discretion.
> If the receiving component determines that it is best able to process the
> record in response to the request, then it shall do so. If the receiving
> component determines that it is not best able to process the record, then
> it shall either: (1) Respond to the request regarding that record, after
> consulting with the component or agency best able to determine whether
> to disclose it and with any other component or agency that has a
> substantial interest in it; or (2) Refer the responsibility for responding to
> the request regarding that record to the component best able to determine
> whether to disclose it, or to another agency that originated the record
> (but only if that agency is subject to the FOIA). Ordinarily, the
> component or agency that originated a record will be presumed to be
> best able to determine whether to disclose it.  . . .
>
> (f) Notice of referral. Whenever a component refers all or any part of the
> responsibility for responding to a request to another component or
> agency, it ordinarily shall notify the requester of the referral and inform
> the requester of the name of each component or agency to which the
> request has been referred and of the part of the request that has been
> referred.

Waterkeepers complain that "as soon as this lawsuit was filed," the Coast Guard "promptly dumped on other agencies" 2,914 pages of documents without any follow-up consideration or release, Pl. Mem. at 11, and that this referral has impaired their ability to obtain records in a timely fashion.  However, the Administrative Record shows that the Coast Guard followed standard DHS regulatory procedures in referring the requested documents to other agencies because they originated elsewhere and the Coast Guard is not expert in oil well decommissioning.  *See* Yemma Decl. ¶ 42 ("[T]he attorneys in [the D8 Legal] office, and other personnel in the Coast Guard, do not possess the subject matter expertise or understanding of decommissioning activities necessary to determine whether the records were exempt from release.").  Further, the Coast Guard repeatedly attempted in good faith to coordinate its response with that of BSEE and Bureau of Ocean Energy Management (BOEM), to which Waterkeepers had submitted an identical FOIA request.  *Id.*, Ex. 5 at 23 (1/31/12 email noting that Coast Guard would evaluate records for consistency with BSEE response and would refer if applicable); *id.*, Ex. 12 at 34-35 (6/5/12 email chain detailing coordination with BSEE/BOEM); *id.* ¶ 29 (2/28/13 D8 Legal Office called BSEE for status update and to request continued coordination).

Once litigation began, the D8 Legal Office formally referred the outstanding documents to the agencies with the know-how to apply any appropriate FOIA exemptions: BSEE, NOAA and DOT.  *Id.* ¶ 30 (3/8/13: D8 Legal Office and BSEE coordinate transfer of 2698 pages to BSEE for independent review and direct response); *id.* ¶ 32 (3/8/14: D8 Legal Office forwards records to NOAA); *id.*, Ex 15 at 42 (3/8/13 letter to Waterkeepers detailing Coast Guard's referral of documents to BSEE, DOT, and NOAA); *id.* ¶ 34 (3/11/13: D8 Legal Office forwarded additional 277 pages to BSEE).  The Coast Guard also notified Waterkeepers

of the referral on March 8, 2013.  *Id.*, Ex 15 at 42.  Thus, its handling of the documents from different agencies was well within the FOIA regulations adopted by DHS.

However, that the Coast Guard complied with its FOIA regulations regarding referral does not necessarily render the withholding proper.  Indeed, as noted above, its referrals would constitute withholding if the net effect is "significantly to impair the requester's ability to obtain the records or significantly to increase the amount of time he must wait to obtain them." *McGehee*, 697 F.2d at 1110.  Here, Waterkeepers submitted their second request to the Coast Guard on December 5, 2011.  Records were not sent to BSEE until March 8, 2013, 15 months later, only a few days after Waterkeepers filed suit.  When Waterkeepers filed their Reply, on March 28, 2014, "none of the 2,895 pages of documents referred to BSEE [had] been released to the Waterkeepers . . . . [and] there is no evidence in the record that the Coast Guard has followed up with BSEE in any way."  Pl. Reply [Dkt. 37] at 7-8.

Nevertheless, the Court cannot find that "[t]he time [Waterkeepers] have waited for the records has been significantly increased by these referrals, so the referral process here constitutes improper withholding."  *Hall*, 668 F. Supp. 2d at 182.  It cannot be overlooked that Waterkeepers sent the exact same FOIA request to BSEE, which had 40 FOIA requests in line to be processed before Waterkeepers' request.  Moreover, BSEE is the agency responsible for efforts to decommission the Taylor Energy wells; the Coast Guard's role is to serve as the on-scene coordinator.  Indeed, Taylor avers that it shared documents with BSEE and that those documents contain trade secrets about inventing new methodologies to accomplish the task of decommissioning the wells.  While the Coast Guard received copies of documents relating to well decommissioning, the documents were sent to BSEE in the first instance.  The Coast Guard states that it does not have the expertise to perform the necessary evaluations, both to protect pre-

decisional government communications and to recognize and protect Taylor Energy trade secrets (such as whether a recovery process is actually new). Thus, BSEE—the primary and expert agency—is the logical agency to apply its expertise and decide whether records it holds are exempt from disclosure under FOIA; BSEE is required to do so not only because Waterkeepers submitted a FOIA request to BSEE *but also* because of the Coast Guard's referral.

In fact, the Coast Guard appears to have waited to coordinate with BSEE and to adopt BSEE's FOIA determinations. After receiving Waterkeepers' second FOIA request, 2012-0684, it repeatedly evaluated its response for consistency with BSEE. *See* Yemma Decl., Ex 5 at 23-24, Ex. 11 at 32, Ex. 12 at 34-36. Before and after the formal referral, the handling of copies in Coast Guard files of BSEE/Taylor records was reliant on the speed with which BSEE could respond to the same FOIA request. This not only makes common sense, as it allows one expert agency to process the request instead of one non-expert scrambling to become expert, but is fully anticipated and compliant with DHS FOIA regulations.

Waterkeepers move to strike Taylor Energy's argument that "because the Waterkeepers submitted a separate FOIA request to BSEE more than two years ago, in December 2011, the Coast Guard should be relieved of its responsibility to fully respond to the FOIA request it received around the same time." Pl. Motion to Strike [Dkt. 41] at 2. Waterkeepers correctly note that mere referral of records to a "second" originating agency can be insufficient to fulfill FOIA responsibilities. Because the circumstances here are materially different from the cases cited by Waterkeepers, the request to strike Taylor's argument will be denied. Here, the "second" agency, BSEE, is identically responsible for answering the same FOIA request *ab initio*. BSEE has expertise to evaluate the records at issue; the Coast Guard does not. Here, the "first" agency, the Coast Guard, has told Waterkeepers and the Court that it

is not equipped to make the necessary judgments on applying FOIA exemptions to the contested records. Waterkeepers do not argue otherwise; they merely insist that the Coast Guard is too slow and therefore violated FOIA. To the contrary, the Coast Guard has complied with FOIA and DHS regulations.

Waterkeepers and Taylor Energy also dispute whether USCG has properly described the records referred to BSEE in the *Vaughn* Index for FOIA Request 2012-0684: Waterkeepers claim that the Coast Guard has not set forth the nature of *any* of the referred documents, while Taylor claims that the descriptions were blank for only four documents, Taylor Reply [Dkt. 39] at 18 n.5 ("[T]he Coast Guard certainly has the ability to fill in these four blanks . . . if that is what the Court determines to be necessary."). The *Vaughn* index reflects more than four blank record descriptions but also includes the claimed FOIA exemption and notes about some of the documents referred to BSEE. *See* Vaughn Index 2 at 1-5. The Court will direct the Coast Guard to provide descriptions for all of the documents in the 2012-0684 *Vaughn* Index. However, regarding any exemptions left blank, it will be for BSEE, the agency with the relevant expertise, to determine whether the information sought should be disclosed and provide its reasoning for any withholding.

**C. Failure to Respond in Timely Manner: December 5, 2011 FOIA Request 2012-0684**

Waterkeepers also complain about lack of timeliness relating to their December 5, 2011 FOIA request and fault the Coast Guard for not releasing any documents during the one year and three months the request was pending before suit was filed. Specifically, Waterkeepers argue that the Coast Guard failed to comply with FOIA's statutory requirement that, within 20 days of the agency receiving a request for documents (or 30 days if the request was rerouted

through the component designated to receive requests),[16] an agency must determine whether to comply with the request and notify the requestor of its determination.  5 U.S.C. § 552(a)(6)(A)(i).  This deadline may be extended up to 30 days in "unusual circumstances."  *Id.* at § 552(a)(6)(B)(i); *Citizens for Responsibility & Ethics in Wash. (CREW) v. Fed. Exch. Comm'n*, 711 F.3d 180, 184 (D.C. Cir. 2013).

Waterkeepers submitted FOIA Request 2012-0684 to the Coast Guard on December 5, 2011.  Yemma Decl. ¶ 9.  The appropriate agency component—the D8 Legal Office—did not respond to the request within the required thirty days.  *Id.* ¶¶ 10-11.  Moreover, even if the D8 Legal Office's response could be considered timely, it only "provided notice" to Waterkeepers that it had received the FOIA request; this is insufficient to constitute an adequate response.  *See Oglesby*, 920 F.2d at 65 ("[An agency's] response is sufficient . . . if it includes: the agency's determination of whether or not to comply with the request; the reasons for its decision; and notice of the right of the requester to appeal to the head of the agency if the initial agency decision is adverse.").

However, the Coast Guard's "untimely responses, in and of themselves, do not entitle [Waterkeepers] to judgment in [their] favor."  *Hainey v. U.S. Dep't of the Interior*, 925 F. Supp. 2d 34, 42 (D.D.C. 2013).  *See also Richardson v. Dep't of Justice*, 730 F. Supp. 2d 225, 231-32 (D.D.C. 2010) ("The timing of an agency's release of records responsive to a FOIA request does not determine whether the agency has complied with its obligations under the FOIA.");  *Jacobs v. Fed. Bureau of Prisons*, 725 F. Supp. 2d 85, 89 (D.D.C. 2010) ("The BOP's

---

[16] *See* 5 U.S.C. § 552(a)(6)(A)(ii) ("The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section.").

untimely response does not entitle plaintiff to judgment in his favor."); *Landmark Legal Found. v. Envtl. Prot. Agency*, 272 F. Supp. 2d 59, 68 (D.D.C. 2003) ("[A] lack of timeliness or compliance with FOIA deadlines does not preclude summary judgment for an agency, nor mandate summary judgment for the requester."). Rather, the relevant question is whether the agency ultimately completed a reasonable search and released non-exempt records. *See Hainey*, 925 F. Supp. 2d at 42 ("'[W]hether the search was completed before or after the requestor files a lawsuit, the remedy available to the plaintiff is the same: access to the documents to which [it] is entitled under the law.'" (quoting *Richardson*, 730 F. Supp. 2d at 232)).

In response to FOIA request 2012-0684, the Coast Guard completed an appropriate search and released three batches of responsive documents to Waterkeepers on March 8, March 15, and March 29, 2013.  Yemma Decl. ¶¶ 33, 38, 39.  On July 8, 2013, the Coast Guard sent its final response, detailing the responsive documents, explaining the applicable exemptions, and notifying Waterkeepers of their right to appeal. *Id.* ¶ 41; *id.*, Ex. 21 at 52-54.  Waterkeepers do not dispute that they received the Coast Guard's final determination. The only issue at this point is whether the Coast Guard's responses comply with its obligations under FOIA.  *Hainey*, 925 F. Supp. 2d at 42; *Atkins v. Dep't of Justice*, No. 90-5095, 1991 WL 185084, at *1 (D.C. Cir. Sept. 18, 1991) ("The question whether DEA complied with the Freedom of Information Act's (FOIA) time limitations in responding to [Plaintiff's] request is moot because DEA has now responded to this motion."); *Crooker v. State Dep't*, 628 F.2d 9, 10 (D.C. Cir. 1980) ("Once the records are produced the substance of the controversy disappears and becomes moot since the disclosure which the suit seeks has already been made.").

### D.  Exhaustion

The Coast Guard and Taylor argue that Waterkeepers failed to exhaust their administrative remedies because they did not file an administrative appeal prior to filing suit.[17] Under FOIA, "[e]xhaustion of administrative remedies is generally required before filing suit in federal court so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision.'" *Judicial Watch, Inc. v. Consumer Fin. Prot. Bureau*, No. 12-931, 2014 WL 1245303, at *3 (D.D.C. March 27, 2014) (quoting *Oglesby*, 920 F.2d at 61)).  Exhaustion is required if the proper agency component responds within the statutory time frame.  *Id.*; *CREW*, 711 F.3d at 188.  An agency response that fails to include the necessary elements may be deemed insufficient to trigger the exhaustion requirement.  *CREW*, 711 F.3d at 188 (agency determination "must be more than just an initial statement that the agency will generally comply with a FOIA request and will produce non-exempt documents and claim exemptions in the future").  "Where the agency fails to issue a determination sufficient to trigger the exhaustion requirement within the statutory timelines, the FOIA requester is deemed to have exhausted administrative remedies." *Judicial Watch*, 2014 WL 1245303, at *3 (citing 5 U.S.C. § 552(a)(6)(C)(i)).  An agency may cure its failure to respond timely before the requester files suit.  *Id.*; *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003) ("If the agency responds to the request after the twenty-day statutory window, but before the requester files suit, the administrative exhaustion requirement still applies.").

---

[17] Taylor states that its exhaustion arguments are only intended to be applicable to Waterkeepers' second count regarding FOIA request 2012-0684.  However, the Coast Guard does not specify whether its exhaustion argument is meant for one or both of Waterkeepers' requests.  Regardless, the Court finds that Waterkeepers exhausted their first FOIA request, 2012-0212, because Waterkeepers filed an administrative appeal, and the Coast Guard did not respond within 20 days or before Waterkeepers filed the Complaint in this case.  As for the second request, 2012-0684, the Court finds the claim constructively exhausted for the reasons set forth above.

Here, the Coast Guard failed to respond sufficiently to Waterkeepers' second FOIA request in a timely manner, and it did not cure that failure because it did not issue its final determination until after Waterkeepers filed the instant action.  Thus, the Court concludes that because the Coast Guard failed to issue its determination within the statutory time period or before this action was filed, Waterkeepers have constructively exhausted their administrative remedies.

### E.  Reliance on FOIA Exemptions

#### 1.  Waterkeepers' First FOIA Request: 2012-0212

The Coast Guard asserts that Exemptions 5 and 7 apply to certain records otherwise responsive to Waterkeepers' first FOIA request.  *See* Patterson Decl., Ex. K at 93-95; *Vaughn* Index 1 [Dkt. 40-1].  Intervenor Defendant Taylor Energy agrees with the Coast Guard's exemption decisions and further asserts that records withheld from the first FOIA request—specifically, those that were generated by or for Taylor—also fall within Exemption 4.[18]  Taylor further contends that its documents are not the type of records to which FOIA was designed to grant access.  In response, Waterkeepers protest that the "administrative record is devoid of support for the Coast Guard's decisions to withhold documents under exemptions four, five, and seven."  Pl. Mem. at 12.

---

[18] Waterkeepers object that Taylor "cannot assert new exemptions on behalf of the government at this point in litigation."  Pl. Reply at 19.  That is incorrect.  "[An] exemption only need be raised at a point in the district court proceedings that gives the court an adequate opportunity to consider it."  *Sciba v. Bd. of Governor of Fed. Reserve Sys.*, 2005 WL 758260, at *1 n.3 (D.D.C. Apr. 1, 2005).  *See also Ctr. for Pub. Integrity v. FCC*, 505 F. Supp. 2d 106, 113 (D.D.C. 2007) (finding plaintiff's argument that the government waived an exemption not raised in its motion for summary judgment without merit.); *Judicial Watch v. Dep't of the Army*, 466 F. Supp. 2d 112, 124 (D.D.C. 2006) (granting reconsideration after summary judgment to consider new exemption not raised by defendant but by intervenor in order to "afford the intervenor an opportunity to raise exemptions" and "protect interests it perceives as threatened in this case" so that "intervenor [is not] disadvantaged or [does not] have its rights compromised").

### i.  Exemption 4

FOIA Exemption 4 protects from disclosure records that contain trade secrets and information that is (1) commercial or financial; (2) obtained from a person; and (3) privileged and confidential.  5 U.S.C. § 552(b)(4); *see also United Technologies Corp. v. United States Dep't of Defense*, 601 F.3d 557, 563 (D.C. Cir. 2010); *Pub. Citizen Health Research Group v. Food and Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).  Under FOIA, a "person" "includes an individual, partnership, corporation, association, or public or private organization other than an agency."  5 U.S.C. § 551(2).  Records are "commercial" as long as the submitter has a "commercial interest" in them.  *Gilda Industries Inc. v. U.S. Customs & Border Protection Bureau*, 457 F. Supp. 2d 6, 9 (D.D.C. 1983) (*citing Pub. Citizen Health Group*, 704 F.2d at 1290); *see also Washington Post v. U.S. Dep't of Heath and Human Serv.*, 690 F.2d 252, 266 (D.C. Cir. 1982).   Information is "commercial" if, "in and of itself," it serves a "commercial function" or is of a "commercial nature."  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (internal citations omitted).

Beyond its commercial or financial character, the analysis of whether information may be withheld under Exemption 4 depends upon whether the information was provided to the government voluntarily or under compulsion.  *Judicial Watch v. U.S. Dep't of Commerce*, 83 F. Supp. 2d 105, 110 (D.D.C. 1999).  When information is voluntarily disclosed to the government, it is considered confidential under Exemption 4 if it is the kind of information "that would customarily not be released to the public by the person from whom it was obtained."  *Id.* (citing *Critical Mass Energy Project*, 975 F.2d at 879).  If submission of the information was required, however, it is considered confidential under Exemption 4 only if its disclosure would likely impair the government's ability to obtain necessary information in the future, or would cause

substantial harm to the competitive position of the person from whom the information was obtained. *Id.*

"[T]he court need not conduct a sophisticated economic analysis of the likely effects of disclosure" in order to find a likelihood of substantial commercial harm. *Pub. Citizen Health Group*, 704 F.2d at 1291 (*citing Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 681 (D.C. Cir. 1976)). "To meet this standard, a [submitter] is not required to prove that substantial harm is 'certain' to result from disclosure, but only that such harm is 'likely.'" *Boeing Co. v. U.S. Dep't of Air Force*, 616 F. Supp. 2d 40, 45 (D.D.C. 2009) (*citing McDonnell Douglas Corp. v. U.S. Dept. of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)). "When determining whether Exemption 4 applies, actual harm does not need to be demonstrated; evidence supporting the existence of potential competitive injury or economic harm is enough for the exemption to apply." *Essex Electro Engineers v. Secr'y of the Army*, 686 F. Supp. 2d 91, 94 (D.D.C. 2010) (*citing Gulf & W. Indus., Inc. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979).

Waterkeepers complain that the Coast Guard's justification for withholding records relies on conclusory statements that "merely parrot[ ] the case law and FOIA statutory text which detail the types of information the exemptions are designed to protect." Pl. Mem. at 14. They also assert that the *Vaughn* index is inadequate for failing to correlate exemption claims to particular parts of withheld documents. The Court disagrees and finds that USCG properly relied on Exemptions 5 and 7 and sufficiently explained why information was withheld without revealing the very information sought to be protected.

Taylor Energy agrees that the Coast Guard properly cited Exemptions 5 and 7 and also contends that all documents generated for or by Taylor Energy are subject to Exemption 4

30

because they are commercial in nature.  Taylor notes that it operated the MC20 Platform to drill

for and recover oil and gas reserves and sell them as a commercial operation.  Specifically, it

asserts:

> The process of continuing to decommission the MC 20 [Platform], plug
> and abandon the wells, platform and pipelines are steps that must occur
> for all oil and gas operations.  Taylor's [documents] all relate to the
> commercial activities required by Taylor to permanently decommission
> all oil and gas equipment, wells and facilities associated with [the MC20
> Platform].
>
> Accordingly, all information gathered, processed, and reported pursuant
> to the decommissioning of the MC 20 [Platform] relates to Taylor's
> business, trade, and/or commerce activities.  *Am. Airlines, Inc.* [*v. Nat'l
> Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978) (holding that
> "commercial" under FOIA includes "anything pertaining or relating to
> or dealing with commerce")].  The subject information, sought to be
> disclosed here, would not exist but for the commercial purposes for
> which it was created.

Taylor Mem. [Dkt. 35-1] at 19.

Taylor also argues that it hired multiple contractors to study and assist in the

remediation and/or decommissioning process, and that their reports are commercial and

protected by Exemption 4.  "The specific reports prepared by (1) Boots & Coots, (2) Waldemar

S. Nelson and Company, (3) Platt, Sparks & Associates, (4) C&C Technologies, and (5) Delmar

Systems, Inc., contain proprietary research, analysis, and conclusions of these contractors who

are engaged in the business of providing well product, maintenance, and other related services

for profit."  *Id.*  Further, Taylor Energy has shared engineering reports, sonar studies,

intervention well analysis, and other reports and documents with BSEE for which it claims

commercial and trade secrets protections.  These records "contain highly confidential

commercial and financial documents" and also "contain valuable trade secrets . . . for which

Taylor paid millions of dollars . . . creat[ing] revolutionary processes and [going] to great lengths

and expense to remediate" the MC20 Platform and drill intervention wells. *Id.* at 20. "The technologically innovative and operational lessons . . . amount[] to extremely proprietary and valuable commercial knowledge and trade secrets." *Id.* While Taylor Energy admittedly is required to complete the decommissioning of the MC20 Platform—permanently plugging and abandoning the wells, and removing the platform and pipelines—its documents responsive to FOIA Request 2012-0212 were submitted to the Coast Guard voluntarily, inasmuch as they were not required by statute, regulation or other informal mandate.

The Court finds that that the withholding of documents generated by or for Taylor Energy, as well as information included in USCG documents that is confidential or proprietary to Taylor, was entirely proper. Information regarding oil and gas leases, prices, quantities and reserves, easily meets the standard of "commercial" information. *See Merit Energy Co. v. Dep't of Interior*, 180 F. Supp. 2d 1184, 1188 (D. Colo. 2001). Further, "[t]he subject information, sought to be disclosed here, would not exist *but for* the commercial purposes for which it was created." Taylor Mem. at 26 (emphasis in original). To the extent documents were submitted involuntarily by Taylor, their release clearly would be likely to cause substantial financial harm by allowing Taylor's competitors to peruse its confidential materials. Indeed, Taylor intervened here because it wanted to protect its own documents and prevent the exposure of trade secrets and confidential information that would cause it substantial harm if released to the public.[19] *See*

---

[19]     [Taylor Energy] has a profound and obvious interest in ensuring that documents, studies, analysis, information and reports it has shared with the USCG as part of the MC20 decommissioning effort remain protected from disclosure under FOIA. [Taylor Energy]'s rights will be impaired if proprietary well intervention techniques, and the analysis and studies resulting in those techniques, are disclosed to the public against its wishes and against the wishes of vendors with which [Taylor Energy] has contractual agreements. [Taylor Energy] has invested significant financial resources in unprecedented decommissioning efforts and has dedicated years of work to addressing the results of the MC20 platform toppling. [Taylor Energy]'s potential return on

Taylor Energy's Mot. to Intervene [Dkt. 9] at 5. Taylor has detailed specifically why its records are subject to Exemption 4, and accordingly, Taylor's motion will be granted insofar as it relies on Exemption 4.[20]

### ii. Exemption 5

The Coast Guard relies on Exemptions 5 and 7 to explain its handling of records responsive to Waterkeepers' first FOIA Request, 2012-021.  FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memoranda or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This exemption encompasses material that is protected under the attorney-client privilege, the attorney work-product privilege, and the deliberative process privilege.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980); *see also NLRB. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) (Exemption 5 includes all documents "normally privileged in the civil discovery context."); *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006) (same).  The deliberative process privilege protects records "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *NLRB*, 421 U.S. at 150.  It also covers "recommendations, draft documents, proposals, suggestions, and other subjective documents

---

these investments, in addition to ensuring that the marine and human environments are protected, will be jeopardized if Plaintiffs' injunction succeeds.
*Id.*

[20] Waterkeepers complain specifically about the failure to produce photographic evidence, *Vaughn* Index 1, Documents CG003606-10, arguing that the photographs do not show a deliberative process or how they will interfere with any investigation.  Taylor Energy maintains that this information is protected under Exemption 4, as it was developed as part of the MC20 investigation and relates to the viability of decommissioning options.  On this record, the Court agrees that photographic evidence reasonably includes confidential protected commercial information.

which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at 866.  Such documents are protected from release to promote "the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001); *accord Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 617 (D.C. Cir. 1997) ("[T]he quality of administrative decision-making would be seriously undermined if agencies were forced to 'operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters would be impossible.") (quoting *Mead Data Cent.,* 566 F.2d at 256).

To qualify for withholding, material must be both predecisional and deliberative. *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005).

> A document is predecisional if it was prepared in order to assist an agency decisionmaker in arriving at his decision, rather than to support a decision already made.  Material is deliberative if it reflects the give-and-take of the consultative process. [The D.C. Circuit's] recent decisions on the deliberativeness inquiry have focused on whether disclosure of the requested material would tend to discourage candid discussion within an agency.

*Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (alteration in original) (citations and internal quotation marks omitted).

The deliberative process privilege generally does not cover the purely factual portions of documents, except in cases where the factual material "is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *Public Citizen, Inc. v. Office of Mgmt. and Budget*, 598 F.3d 865, 876 (D.C. Cir. 2009) ("[A]gencies must disclose those portions of predecisional and deliberative documents that contain factual

information that does not inevitably reveal the government's deliberations.") (internal quotations omitted).

In response to Waterkeepers' first FOIA request, the Coast Guard states that the withheld documents are predecisional because "they are intra-agency, pre-decisional communications consisting of analyses, judgments, conclusions, opinions, and recommendations made by Coast Guard officials with regard to the subject incident investigation." Patterson Decl. ¶ 18. The Coast Guard further describes the records as deliberative because they "contain opinions, analyses, and/or recommendations, the disclosure of which would likely create confusion where such input was not ultimately the basis for Coast Guard actions." Patterson Decl. ¶ 19.

Exemption 5 clearly applies to pre-decisional federal records involving the complex recovery process after the collapse of the MC20 platform. Waterkeepers do not disagree. Instead, they argue that there *must* be more information that can be released to the public about an ongoing oil leak, this many years after the hurricane. However, the clean-up is not concluded, Taylor Energy describes in detail the complexities of the process, and it is no surprise that those difficulties would prompt ongoing discussion, evaluation, proposals, and ideas within the Coast Guard. The purpose of Exemption 5 is to shield those very discussions, evaluations, proposals and ideas so that they can be robust without fear of premature public reaction or confusion. The Court finds that the Coast Guard properly relied on Exemption 5 in these circumstances; the passage of time since the hurricane is not a legal basis on which to fault the agency.

### iii.   Exemption 7

The Coast Guard also relies on Exemption 7, which protects documents compiled for law enforcement purposes to the extent that production of such information could reasonably be expected to interfere with enforcement proceedings.  5 U.S.C. § 552(b)(7).  The Coast Guard has stated that the records were compiled as part of an investigation into the cause of the oil spill and for determining appropriate penalties.  Therefore, it asserts, "[d]isclosure of information here may inform the public on how the Coast Guard performs its mission, its internal operations, and how it conducts investigations of oil spills," USCG Mem. at 34, and "[p]remature release of information could create confusion . . . and/or hinder potential legal courses of action." Patterson Decl. ¶ 22.  This may be so.  But the Coast Guard has not tied these generalized statements to specific documents.  The Court finds that the Coast Guard has not supported its reliance on Exemption 7 but that Exemptions 4 and 5, discussed above, are sufficient to for the withholding of records in whole or in part that are responsive to Waterkeepers' First FOIA Request.

### 2.   Waterkeepers' Second FOIA Request: 2012-0684

### i.   Exemption 4

The Coast Guard specifically relies on Exemption 4 to support its withholding of 263 pages of records in whole and 14 pages in part that are responsive to Waterkeepers' Second FOIA Request.  The Coast Guard notes that the records were provided voluntarily to the Coast Guard by Taylor Energy, which in turn "asserts that the records contained proprietary scientific and engineering information related to its efforts to permanently decommission all wells associated with MC20."  USCG Mem. at 30 (citing Yemma Decl. ¶ 43(b)).  As for other documents that were provided involuntarily by Taylor Energy, the Coast Guard argues they also

are covered by Exemption 4 because their release would cause a commercial disadvantage to Taylor Energy.  *Id.*

The Court finds that Exemption 4 protects the identified records sought by Waterkeepers' second FOIA request.  As Taylor Energy explains, the records for which the Coast Guard claimed Exemption 4 are commercial in nature because they are "related to Taylor's MC20 facility and Taylor's complex, unprecedented and on-going decommissioning efforts for the destroyed facility.  In fact, all information gathered, processed, shared, and related in any way to the ultimate decommissioning of MC20 or to proprietary equipment or procedures developed by Taylor is commercial information that is exempt from FOIA production."  Taylor Mem. at 26 (citations omitted). Taylor also notes that most of the documents were disclosed voluntarily, and that those that were submitted involuntarily contain sensitive trade secret information that would cause substantial harm if released, undermining Taylor's competitiveness in the market.  *Id.* at 27-28.[21]

### ii.  Exemption 5

The Coast Guard also cited Exemption 5 in its response to Waterkeepers' second FOIA request, stating that the withheld information—which "includes internal emails discussing proposed Coast Guard responses to media inquiries regarding the MC20 response"—is deliberative and subject to Exemption 5 "because it reflects the give-and-take of

---

[21] In Reply, Taylor Energy argues that this Court has already determined that certain Taylor documents are protected from disclosure due to their commercial and confidential nature.  Taylor Reply at 21-22 (citing *Taylor Energy Co. v. U.S. Dep't of the Interior*, 734 F. Supp. 2d 112 (D.D.C. 2010)).  Moving to strike, Waterkeepers contend that this is a new argument that asks "this Court [to] expand upon the ruling . . . to apply blanket confidentiality to all withheld documents related to the MC 20 oil leak."  Motion to Strike at 3.  The Court does not construe the argument as one for "blanket confidentiality," but rather an attempt to convince this Court to adopt the conclusions of another judge. Accordingly, Waterkeepers' motion to strike this argument will be denied.

the consultative process, and is withheld so as to not discourage candid discussion within the agency." Yemma Decl. ¶ 43(c). The *Vaughn* Index confirms that records withheld under to Exemption 5 are internal agency communications or strategic deliberations drafted in response to media inquiries surrounding the MC20 decommissioning. *See Vaughn* Index 2 at 2-5. Accordingly, the Court finds these records properly withheld and will grant summary judgment in this respect.

### 3. Segregability

As noted above, FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Despite the Court's holding that the records sought by Waterkeepers are protected by Exemptions 4 or 5, the Coast Guard has not explained adequately why no factual materials within these records can be segregated and released. In its correspondence to Waterkeepers, Coast Guard decisionmakers referenced segregability analyses but the pleadings are silent. The single statement regarding FOIA Request 2012-0212 that "the facts generated in the course of this decision-making process are inextricably connected to the deliberative material, and thus impossible to reasonably segregate," Patterson Decl. ¶ 18, is insufficient without more explanation. Remand for such analysis is required. *In camera* review is not warranted at this juncture. *See Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 120 (D.D.C. 2005).

## IV.    CONCLUSION

Accordingly, Plaintiffs' motion for summary judgment [Dkt. 27] will be denied. Further, Defendant United States Coast Guard's and Intervenor-Defendant Taylor Energy's motions for summary judgment [Dkts. 32 & 35] will be granted in part, to the extent that

documents were withheld properly under Exemptions 4 and 5.  The Coast Guard shall submit a

revised *Vaughn* index for FOIA request 2012-0684 that includes descriptions for all referred

documents.  Plaintiffs' motion to strike [Dkt. 41] will be denied, as well as Taylor's request for

attorney fees associated with responding to that motion [Dkt. 42] .  The case will be remanded

for further proceedings consistent with this Opinion and Order.  A memorializing Order

accompanies this Opinion.

.

Date: September 29, 2014                                                    /s/
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge